No. 23,809.

H. C. Grilley, *Appellee*, v. Charles Myers, *Appellant*.

SYLLABUS BY THE COURT.

1. Contract — *To Thresh Wheat* — *Consideration* — *Breach by Defendant* — *Damages—Evidence*. The evidence examined and found sufficient to support the allegations of the petition touching the contract sued on, to thresh the plaintiff's wheat as soon as cut.

2. Same. The evidence is found to support the verdict as to the amount of damages stated therein.

3. Same. Consideration for the alleged contract, and acceptance thereof, held to be fairly established.

4. Same. Sufficient basis appears for the damages awarded by the jury.

5. Same. No material error appears touching the admission of evidence.

Appeal from Wyandotte district court, division No. 1; Edward L. Fischer, judge. Opinion filed June 10, 1922. Affirmed.

*J. O. Emerson*, and *James F. Getty*, both of Kansas City, for the appellant.

*David F. Carson, C. A. Miller*, and *James T. Cochran*, all of Kansas City, for the appellee.

The opinion of the court was delivered by

West, J.: The defendant appeals from a judgment recovered against him for damages for failure to thresh the plaintiff's wheat.

The plaintiff lived in the north bottoms near Kansas City, Kan., and rented wheat land there, and the defendant owned a threshing machine. It appears that in these bottoms the soil is very rich and that after the wheat is put in shock, unless speedily threshed, dampness and growth of heavy vines usually cause considerable damage.

The plaintiff alleged that in the summer of 1918, he entered into an oral contract with the defendant that as soon as the plaintiff's wheat was cut and ready for threshing the defendant would immediately begin to thresh the same and complete the work without delay. A résumé of this agreement was given by the plaintiff on the stand, that the defendant asked him if there was any ground in the bottoms that he could get:

" 'Now, if I could get ground down there, I would bring my thresher down there just as soon as the last bundle was cut, and would thresh it.' So I talked with Mr. Reimer in regard to his field. The next day we made a deal. I talked to Mr. Reimer about it, and Mr. Reimer and I came to a conclusion as to what we would do which was afterwards presented to Mr. Myers. . . . Mr. Reimer, Mr. Myers and myself afterwards had a conversation with

reference to that piece of land Mr. Reimer and I rented from Mr. Stanley. . . . I took Mr. Stanley out there and Mr. Myers told us if we would turn him over this ground to put in wheat, as soon as the last bundle was cut there he would be there with his machine to thresh it. He told me that if I would turn over this ground, he would come and thresh my grain as soon as the last bundle was cut, which I did, between 40 and 50 acres."

He further testified that he finished cutting his wheat in July, shocked it well, but it was tangled and was heavy, well-grained wheat; that he had about 115 acres; that it was left shocked according to the custom there; that the defendant failed to come and thresh it and it turned out that he had moved away, and it was claimed he had sold his machine. The plaintiff stated he made an effort to get his threshing done; that he knew of one other machine in that part of the country but could not get it; that finally another man came with the same machine the defendant had had and did the work; that by that time the wheat was growing over with vines and there had been rains and heavy dews; that the wheat had begun to sprout and it was very wet, and the price was greatly diminished. He finally got 1,200 bushels out of the crop and he had 60 bushels too wet to sell to the elevator. He testified to renting from Mr. Stanley 40 acres of the land, which was a part of the land the defendant afterwards put in wheat.

Henry Reimer testified that he had been growing wheat in these bottoms for the last few years and was present when some conversation was had between the parties in the presence of others about threshing the crop in the season of 1919. Myers said he would like to have some wheat land and witness and Mr. Grilley talked the matter over and came to an agreement:

"We got together over there by the threshing machine. When Mr. Myers was present, Mr. Myers, Mr. Grilley and I talked over the matter of the fall threshing of 1919. . . . And Myers said then that if he would get that land, we sure wouldn't have to wait for a threshing machine—when the last bundle was cut he would be right down there and thresh for us. He got the land. I had 50 acres of the land rented. I would not have given up the land if Mr. Myers had not made the agreement to come and thresh immediately as soon as the last shock was cut. Mr. Myers got the land with the consent of Mr. Stanley who was present."

Witness said that he rented 50 acres from Stanley, the same 50 acres Myers put in wheat.

"I rented that 50 acres of Stanley some time when we were cutting wheat in July. I rented it from him myself and I am the man that had the 50 acres that was finally given up to Mr. Myers. Stanley rented it to me. . . .

"Mr. Grilley also had some land down there that he rented from Stanley.

Grilley v. Myers.

Mr. Grilley rented about 43 or 45 acres from Mr. Stanley; I don't know the exact number. Both what I had and what Mr. Grilley had was turned over to Mr. Myers."

A. C. Bates testified, among other things, that he helped work in this wheat after it was shocked; that he and several others worked together:

"When we first started, the vines was all that was necessary to be tore off. The wheat was in fairly good enough shape to thresh then. After the rain come, and the wheat got to growing, of course, it growed and matted together. Then we had to take and tear the shocks all apart, and scatter them around, so the sun would dry them out. We put in about two or three days doing this; probably four days. The threshing was going on while we were doing this. Monday morning we got started to threshing, and we just threshed about three hours, and that was when the rain come; and from that time, then when we got started threshing again, it was between seven and eight days. I saw the first wheat that was threshed on that first morning. It was in good shape;  . . .

"I observed the wheat after it was threshed and all excepting what they threshed the first morning that the machine started on Mr. Grilley's wheat, was all wet wheat and sprouted. . . . That was all damp and sprouted. There was anyway two-thirds of the grain sprouted. This is true of all the wheat except the wheat that was threshed the first two hours."

An elevator employee testified that he made a record showing the grade of plaintiff's wheat, which tested 55 pounds to the bushel, moisture 12.2, graded 4 on account of test weight; that 55 pounds to a bushel represents a low quality of wheat; 4,720 pounds of Grilley's wheat graded No. 4 and brought $2.06; the government price on No. 1 was $2.18, No. 2, $2.15 and No. 3, $2.12.

Jack Adair testified that he helped get the Grilley wheat ready for threshing and when they took the vines off the wheat it had sprouted and the wheat was damp all the way down through the shock; some of it would not go through the machine and they had to throw one or two or three bundles out of every shock.

J. P. Jobe testified that he helped through the threshing of the Grilley wheat which was four or five weeks after the cutting was finished; that when the threshing was begun the wheat was in pretty fair shape, and then came the rain and it began to grow and sprout.

"The wheat was wet and sprouted and it choked up the separator. They would have to pull the straw out at the back end of the machine. I noticed that the wheat was being blown out through the blower; the wheat went through the blower and choked it."

He judged between a third and a half of the wheat was wasted by the bundles thrown away. The plaintiff's son swore to substantially the same matter.

Mr. Stanley, who had charge of the land, testified about the conversation touching the renting of this land to the defendant; that Myers and Grilley said they thought it would be the best for everybody if they could get this threshing machine down there first, and the witness said they made arrangements to rent the land to Mr. Myers and Kopfer.

"Mr. Grilley and Mr. Reimer told me that Mr. Myers and his engineer Kopfer wanted to rent some wheat land and they Reimer and Grilley, would relinquish the land I had rented to them to Myers and Kopfer on condition that Myers would thresh there first next year. . . . I agreed on behalf of F. N. Clark to rent that available wheat land to Mr. Myers and Mr. Kopfer on the basis of one-third of the grain. . . ."

On cross-examination, he testified:

"During June or July, 1918, I rented the land to Reimer and Grilley that Kopfer and Myers afterwards put in."

The defendant assigns as error the admission of incompetent evidence, the exclusion of competent evidence, the overruling of the demurrer to the plaintiff's evidence, the refusal of certain instructions, the giving of others and the denial of a new trial.

It is first contended in the brief that no valid contract was proved; that the arrangement testified to was too uncertain and indefinite to amount to a binding agreement, and authorities are cited touching the certainty and definiteness necessary to constitute a valid contract. We find no difficulty, however, in believing from the testimony that the defendant wanted some of this bottom land to put in wheat and agreed with the plaintiff if he would rent him something like 40 acres he would begin threshing as soon as the wheat was cut.

It is argued that there was no acceptance of the provisions shown, but the testimony indicates that the proposition came from the defendant and was accepted by the plaintiff and that an arrangement was made by which something like 40 acres of plaintiff's leased land was turned over to the defendant so that he might sow it in wheat.

The trouble seems to be that after getting the land the defendant sold his machine, and apparently went out of the threshing business, paying no attention to the contract by virtue of which he had secured the land.

It is further contended that no consideration passed from the plaintiff to the defendant to sustain the alleged contract, but one of

Grilley v. Myers.

the primer principles of contract law is that a promise is a good consideration for another promise, and the plaintiff testified that the defendant promised to thresh his wheat promptly, in consideration of which the plaintiff promised to turn the land over to him, and did so.

Some difficulty is professed to be found in giving proper significance to the phrase "turn him over the land," but the testimony made it quite clear that after the plaintiff had rented certain land he allowed the defendant to step into his shoes as lessee, thereby "turning it over" to him, and allowed him to sow wheat as plaintiff intended to do.

It is further suggested that if the plaintiff was to transfer the right to the use of the land for the ensuing year he had no assignable or transferable interest, and in support of this suggestion it is pointed out that the defendant proceeded to lease the land of Mr. Stanley, agent of the owner. Very true, but Mr. Stanley testified that it was in pursuance of the agreement on the part of the plaintiff that the land which he had already rented to Grilley and Reimer should be turned over to the defendant.

It is argued that there is no evidential basis for the amount of damages assessed. It is pointed out that one of the plaintiff's claims was for $2,616, or one-half the wheat worth $2.18, and another that about 1,200 bushels were damaged to the amount of $340, and it is argued that the $1,800 returned must have been based, or partly based, upon the first claim. From the evidence, however, the jury might well have concluded that had the contract been lived up to, and the threshing done as soon as the wheat was cut, a very different yield and price would have resulted to the plaintiff, and the testimony touching the result of the delay, the grade of the wheat, its dampness and its price afforded substantial basis for the verdict returned.

The objections to certain rulings on evidence have been examined and considered, and we find no materially prejudicial error therein. The complaint that Mr. Stanley was permitted to state that he had rented the land to Myers that he had previously rented to the plaintiff and Reimer, who "relinquished" it, is not serious in view of the fact that he had already gone all over this matter, giving in substance the conversations from which these conclusions as to "renting" and "relinquishing" are fairly to be drawn.

Finding no error affecting the substantial rights of the defendant, the judgment is affirmed.